## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STEVEN MARIL,** | |
| **Plaintiff,** | |
| | **09C3050** |
| **- v -** | **09C6161** |
| | **Consolidated** |
| **TRUE VALUE COMPANY, et al.,** | **Judge Hibbler** |
| | **Magistrate Judge Mason** |
| **Defendants.** | |

### DEFENDANTS' MOTION TO COMPEL

Defendants, True Value Company, Cathy C. Anderson, and Amy W. Mysel ("Defendants"), for their Motion to Compel, hereby state as follows:

1.    Plaintiff filed two separate lawsuits, one in state court, which Defendants removed to federal court, and a federal court lawsuit based on a subsequently issued right to sue letter by the EEOC over an alleged claim under the Americans with Disabilities Act ("ADA"), which have been consolidated before this Court.  In the consolidated action, Plaintiff brings a claim against Defendant True Value Company under the ADA, and various common law actions, including claims for breach of contract and tortious interference with a contract.

2.    Defendants served their initial discovery requests in November 2008, when one of these consolidated cases was pending in state court.  Defendants served a second set of discovery requests in June 17, 2009.  Although Plaintiff has served written responses to Defendants discovery requests, Plaintiff has affirmatively refused and/or failed to produce the requested information, which is central to Plaintiff's claims or Defendants' defenses in this case.  The requested information includes information relating to Plaintiff's medical and mental health

treatment, basic income information, and job search information.   Defendants are entitled to

responses to these basic discovery requests.

**I.**     **Plaintiff Should Be Compelled To Produce Information Relating To His Medical And Mental Health Treatment.**

    3.    Plaintiff's complaint[1] places into issue the nature of his medical condition:

- "Plaintiff Steven Maril, . . . suffers from Multiple Sclerosis" (Complaint, para. 1, attached hereto as exhibit 1)

- "At the time of his hire, Mr. Maril informed General Counsel and Senior Vice President of Human Resources, Rob Ostrov, that he had Multiple Sclerosis, which necessitated that he work from home depending on the severity of his illness and/or the travels required for his job." (Complaint, para. 7 attached hereto as exhibit 1)

- "[In] approximately April 2006, . . .Mr. Maril had to increase his hours working from home as his health deteriorated due to the worsening state of his Multiple Sclerosis." (Complaint, para.  8 attached hereto as exhibit 1)

- "Around April 2006, Mr. Maril discussed with defendant Anderson the worsening state of his Multiple Sclerosis and informed defendant Anderson that his Multiple Sclerosis made it impossible for him to work from the office for the time-being." (Complaint, para. 9 attached hereto as exhibit 1)

- "Then around late September 2006, Mr. Maril had to cancel business travels and instead work from home due to the extreme fatigue caused by his Multiple Sclerosis." (Complaint, para. 11 attached hereto as exhibit 1)

---

[1] Although, as noted above, Plaintiff has filed two complaints, the factual allegations are virtually word-for-word copies of one another.  For purposes of simplicity and the court's convenience, Defendants' reference to the "complaint" will refer to the ADA complaint, unless noted otherwise.

4.     Plaintiff's complaint also places into issue whether Plaintiff was, during his employment by Defendant True Value,  a "qualified individual with a disability" under the Americans with Disabilities Act:

- "During Mr. Maril's employment with defendant, Mr. Maril was . . . a "qualified individual with a disability" within the definition of §101(8) of the Americans with Disabilities Act of 1990 [42 U.S.C. §12111(8)]." (Complaint, para. 25 attached hereto as exhibit 1)

5.     Plaintiff's lawsuit also places into issue whether he suffered damages on account of his  alleged medical condition:

- "Plaintiff Steven Maril prays for: . . . Compensatory damages for the harm he suffered as a result of defendant's discriminating against him on the basis of his disability." (Complaint, para. 33 g attached hereto as exhibit 1)

6.     Plaintiff's counsel represented to defense counsel that the compensatory damages that his client was seeking including alleged damages for emotional distress.

7.     Accordingly, Defendants sought discovery into Plaintiff's alleged medical condition and the emotional distress that he allegedly suffered as a result of Defendant's conduct.  On June 17, 2009, Defendants propounded their Second Set of Interrogatories.  In Interrogatory No. 4 of their Second Set of Interrogatories, Defendants requested the names of the medical professionals who have treated Plaintiff for the past 5 years, the treatments given, and the documents relating to such medical treatment.

8.     On April 26, 2010, Plaintiff objected to answering such discovery and referred Defendants to Plaintiff initial disclosures:

4. Has Plaintiff received any treatment from any medical or medical-related providers, including but not limited to any doctors, nurses, hospitals, psychiatrists, psychologists, licensed clinical social workers, medical clinics, podiatrists, ophthalmologists, surgeons, anesthesiologists, or any other medical provider (hereinafter "Treaters") in the past five years? If so, identify these treaters, the treatment given, and any documents relating to the treatment given by these treaters.

<u>Objection:</u> Plaintiff objects to this Interrogatory to the extent it inquires into treatment for any condition plaintiff may have other than Multiple Sclerosis as not reasonably calculated to lead to the discovery of admissible evidence about any of the parties' claims or defenses in this matter, as violating physician/patient and other medical-provider/patient privileges, and as subjecting plaintiff to undue embarrassment and harassment. Without waiving those objections, plaintiff states:

<u>Answer:</u> As to those Treaters from whom I have received treatment for my Multiple Sclerosis within the past five years, see my Initial Disclosures.

(Plaintiff's answers to Defendant's Second Set of Interrogatories, attached hereto as exhibit 2.)

9. Plaintiff's initial disclosures, a copy of which is attached hereto as exhibit 3, identified the following medical professionals as having knowledge relating to Plaintiff's claim:

| | |
|---|---|
| Dr. George Katsamakis<br>Northwest Neurology, Ltd.<br>1732 W. Algonquin Rd.<br>Arlington Heights, IL 60169<br>847-882-6604 | Plaintiff's medical condition in late 2006; medical tests he prescribed for Plaintiff. |
| Dr. I. James Young<br><br>Current contact information unknown | Plaintiff's multiple sclerosis while employed by Defendant True Value; Plaintiff's need for a reasonable accommodation for his disability while employed by Defendant True Value; Plaintiff's need for medical leave. |

10. Defendants requested a medical release from Plaintiff in order to subpoena his medical records from the above listed treaters. After much delay by Plaintiff, he finally

submitted a limited medical release. (Exhibit 4) Notably, Plaintiff did not provide such a release when he identified these doctors in his original 26(a)(1) disclosures on April 2, 2010, nor on April 26, 2010 when he referenced these disclosures in his objections to interrogatories. Plaintiff did not provide the release requested until late May 2010. Defendants have not been able to proceed with Plaintiff's deposition because they have not had a complete response to Defendant's discovery requests.

11.     In the interim, Defendants learned that one of the two doctors that Plaintiff named in his discovery responses, Dr. Young, had been dead since December 2005 (over a year prior to the issues raised in Plaintiff's litigation). Plaintiff's counsel later clarified that Plaintiff had not been treated by Dr. Young since 1992.

12.     The records from the second doctor named by Plaintiff, Dr. Katsamakis, show that he saw Plaintiff only once and clearly had not been "treating" Plaintiff for his medical condition, but merely ordered tests, the results of which are not in the records; nor is there any record that Plaintiff actually followed through with undergoing the tests ordered by Dr. Katsamakis.

13.     On June 10, 2010, Defendants sent a letter to Plaintiff outlining the deficiencies in his discovery responses. In response, Plaintiff identified a third doctor, Dr. Bikshorn, who practices at the same office as Dr. Katsamakis, and stated that Plaintiff saw Dr. Bikshorn "in or around 1995 and maybe another time after that." Exhibit 5.[2]

14.     Thus, Plaintiff's sworn interrogatories and the medical records that Defendants have received pursuant thereto show that Plaintiff has been treated only once in the last 5 years for the Multiple Sclerosis from which Plaintiff claims to be suffering, and there is no record that Plaintiff ever followed up on the tests that were ordered by that treating doctor.

---

[2] In response to Defendants' letter detailing the deficiencies in Plaintiff's discovery responses, Plaintiff's Counsel merely noted his comments in the margins of Defendants' letter.

15.     These records are not consistent with Plaintiff's allegations in his complaint, namely that he allegedly suffered from Multiple Sclerosis (Complaint, para. 1, attached hereto as exhibit 1); that the Multiple Sclerosis was allegedly so severe that he needed to work from home (Complaint, para. 8, Attached as exh. 1), that in April 2006 his Multiple Sclerosis allegedly deteriorated so much that he spend more time working from home (Complaint, para. 9), that in April 2006 his medical state worsened so much that he could not work at the office at all (Complaint, para. 10), and that, in September 2006, Plaintiff's alleged Multiple Sclerosis worsened so much that he had to cancel business plans (Complaint, para. 11).

16.     Defendants reasonably expect that if any of the foregoing allegations were actually true Plaintiff would have sought medical advice and/or medical records would exist in which doctors would have treated Plaintiff concerning these matters.    Accordingly, Defendants reasonably do not believe that Plaintiff has identified all of his treaters.

17.     Therefore, despite claiming in this lawsuit that in early 2006 and 2007, he was so debilitated from his Multiple Sclerosis that he could not come into the office, Plaintiff has failed to name a single doctor that treated him for his condition during the relevant time period.  If no such doctors exist, Plaintiff should so state as opposed to sending Defendants on "wild goose" chances and incurring costs searching for doctors who have not treated Plaintiff for decades.

18.     Further, Plaintiff refuses to identify the one medical doctor who Plaintiff apparently was seeing for treatment during the relevant time period.  Plaintiff claims that he saw this doctor, a urologist, for "an unrelated condition."  Exhibit 5.  However, MS causes urological disorders in a majority of patients.   (See The Journal of Urology, Volume 161, Issue 3, pp. 743-757, "Multiple Sclerosis and the Urologist" (abstract), attached Exh. 6)   Thus, Plaintiff should be required to identify this doctor and Defendants should be entitled to take discovery of this doctor

6

and the doctor's medical records, which are likely to be probative on the question of whether Plaintiff is, in fact, suffering from MS and, if so, whether there is any basis to his allegations that: (1) his condition was such that he had to work from home, and (2) his condition was deteriorating in 2006 such that he could not work in the office and had to cancel business plans. Further, given Plaintiff's claim in this case that Plaintiff was a "qualified individual" as defined by the ADA and Plaintiff's lack of other medical evidence to support his claim of Multiple Sclerosis, Defendants are entitled to this information.

19.     Moreover, Plaintiff has admitted that he also was seeking mental health care during the relevant time period, but he refuses to identify these treaters, also. Defendants are entitled to discovery on these mental health providers because the physical symptoms that Plaintiff claims he was experiencing, including extreme fatigue, could be attributed to a mental health condition. For example, recent studies indicate that there is a link between depression and extreme fatigue. (See Psychosomatic Medicine, Issue 66, pages 330-335 (2004) "Temporal Relations Between Unexplained Fatigue and Depression: Longitudinal Data From an International Study in Primary Care (abstract), exh. 7 attached). Whether Plaintiff's alleged fatigue was caused by alleged MS or alleged mental illness (or medications that he took to treat his alleged mental illness) is relevant because Plaintiff expressly alleges in his complaint that he told Defendant True Value that he had to work from home on account of his allegedly deteriorating MS (Complaint, para. 9) and had to cancel business plans because of alleged fatigue resulting from his MS (Complaint, para. 11). Plaintiff's mental health records are relevant because if the fatigue that Plaintiff alleges that he was suffering was actually caused by mental illness (or drugs taken to combat mental illness), Defendants would be allowed to introduce such evidence to call into question the veracity of Plaintiff's allegations. Thus, Plaintiff has waived whatever privilege he may have

had in his psychiatric records by placing the issue of whether he gave notice about his alleged MS-inducing fatigue into issue. *See Metzger v. Francis W. Parker School*, 2001 WL 910443 (N.D. Ill.) (allowing discovery into mental health records where Plaintiff places it into issue); *Wynne v. Loyola University of Chicago*, 1999 WL 759401 (N.D. Ill) (noting that "allowing a plaintiff to hide behind a claim of privilege when that condition is placed directly at issue in a case would simply be contrary to the most basic sense of fairness and justice"); *see generally Sarko v. Penn-Del Directory Company*, 170 F.R.D. 127 (E.D. Pa. 1997) (noting that "to the extent that the records of any of the providers contain information relating to the nature of Plaintiff's alleged disability, her need for medication, or the side effects of the medication, they are clearly relevant under Rule 26(b)(1) to Plaintiff's ADA claim").

20.     Defendants should also be entitled to discovery of Plaintiff's mental health records to learn whether Plaintiff ever discussed the alleged fatigue with his treating psychiatrist. It may be reasonable to expect someone allegedly suffering from MS who allegedly suffers such increasing fatigue that he can no longer go to the office to work or keep scheduled business plans to mention these developments to his treating psychiatrist. The absence of any such mention to a treating psychiatrist may be a basis for a reasonable factfinder to infer that they did not occur or that Plaintiff is not telling the truth. Thus, Defendants' request for Plaintiff's mental health records is reasonably calculated to lead to the discovery of admissible evidence as required by Rule 26 and, therefore, such records are discoverable. Further, Plaintiff has placed these records into issue. Any concerns that Plaintiff may have about maintaining the confidentiality of his medical records may be addressed through a protective order. Indeed, Defendants notified Plaintiff's counsel that they are aware of potential confidentiality concerns and invited Plaintiff to move for an entry of a protective order, and have voluntarily agreed in the interim to maintain

the confidentiality of Plaintiff's medical records. Plaintiff's counsel submitted a draft protective order late today and Defendants are reviewing it.

21.    Finally, given the fact that Plaintiff has indicated that there are other treaters of his alleged MS prior to the 5-year period that Defendants originally requested, going back as far as 1992, Defendants should be allowed to take discovery of these records also, as they relate to Plaintiff's contention that he suffered from MS. It appears that such records are scant if they exist at all. However, if, as it appears, Plaintiff has been treated only once or twice in 18 years for his alleged MS and has failed to follow-up on tests that his treaters have prescribed, Defendants should be allowed to discovery such evidence as it is probative on Plaintiff's claim under the ADA.

22.    Therefore, Defendants are entitled to the identity of all of Plaintiff's medical and mental health care providers over the past five years, which includes the relevant time period, and should be allowed to learn the identities of all of Plaintiff's medical providers for his alleged MS treatment dating back to 1992.

## II.    Defendants Are Entitled To Documentation Of Plaintiff's Income and Information Relating to Plaintiff's Job Search Efforts.

23.    Plaintiff seeks in this case over $730,000 in backpay wages, alone, claiming he earned no income since his employment ended in April 2007. Exhibits 3 and 8. Plaintiff, who is a labor and employment attorney, also claims that he has been unable to obtain a job since April 2007. However, Plaintiff has produced no evidence of these claims in response to Defendants' discovery requests. Defendants are entitled to such information and if Plaintiff continues to refuse to produce such information, he should be barred from recovering any damages for his claim of loss of income.

24.     Specifically, in Interrogatory Nos. 8 and 9 and Production Requests Nos. 6 and 8, Defendants requested information regarding Plaintiff's sources of income, including Plaintiff's income tax records. However, Plaintiff has not produced a single document in response to these requests. Moreover, the only income identified by Plaintiff that he received over the last three years since April 2007 is unemployment compensation. Plaintiff has refused to produce his income tax records, which would be the best evidence of his income, claiming that he would provide case citations to support his position, but he has yet to do so. Exhibit 5. Further, Plaintiff owns a business called Law Dog Stables, Inc., which buys, races, and breeds thoroughbred race horses, but Plaintiff has not provided any revenue documentation relating to this business. Exhibit 8, Response to Interrogatory No. 8.

25.     With regard to Plaintiff's job search efforts, Plaintiff responded to Interrogatory No. 7, which asked Plaintiff to identify his efforts to seek employment, including specifying the date of such attempt, the nature of the attempt, the person contacted, and the result of the attempt, as follows:

> I applied for positions with Glass America, United Financial, AJ Gempt, Andrew Corp., Harrahs, and many other companies listed in "The Chicago Bank" from June, 2007 through September, 2008. Beginning in February 2009, I again have been looking for work using these same resources. I do not know the answers to the other questions asked in the interrogatories.

26.     Plaintiff then supplemented his response by submitting a 32-page list of jobs from "The Chicago Bank" book and claiming that he submitted a resume to each one. Exhibit 9. However, Plaintiff has yet to even produce a copy of his resume. Moreover, he has failed to identify who he contacted, whether there was any follow up or the ultimate result of his contact for any of these entities he claims to have submitted a resume.

10

27.     The information requested goes to the heart of Plaintiff's claim for damages or any legitimate attempt to mitigate his damages, which is information that Defendants are absolutely entitled to in this case.  Therefore, Plaintiff should be compelled to produce information and documentation of his income from 2007 to present, including the best evidence of his income, his income tax return.  In addition, Plaintiff should be ordered to answer the discovery requests relating to his job search efforts, including when he made contact with the potential employers, who was the contact, and what was the result of that contact.

28.     In accordance with Local Rule 37.2, Defendants state that, prior to filing this Motion, Defense Counsel consulted with Plaintiff's Counsel in person, by telephone and via email and made good faith attempts to resolve differences, but were unable to reach an accord.  Those consultations occurred between one of Defense Counsel, Jennifer Naber, and Plaintiff's Counsel, David L. Lee.  The Parties' Counsel met, in person, for a Rule 37.2 conference on June 10, 2010.  In addition to the in-person meeting, Defense Counsel corresponded with Plaintiff's Counsel on May 26, 2009, June 10, 2010, June 14, 2010, June 21, 2010 and June 30, 2010.  In addition to the in-person meetings, Defense Counsel also had several telephone conversations with Plaintiff's Counsel and exchanged numerous emails, which are attached to this Motion as Exhibit 10.

WHEREFORE, Defendants respectfully request that this Court grant this Motion to Compel and order Plaintiff to provide complete responses the discovery requests relating to his medical and mental health care treating professionals, sources of income, and job search efforts.

Dated:  July 12, 2010

Respectfully submitted,

/s/ Thomas S. Bradley
Thomas S. Bradley, One of the Attorneys for Defendants

11

Thomas S. Bradley (06199054)
Laner, Muchin, Dombrow, Becker,
  Levin and Tominberg, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 (fax)
tbradley@lanermuchin.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 12, 2010, I caused **Defendants' Motion to Compel** in the above-captioned matter to be filed with the Clerk of the District Court and served on the parties of record listed below, by operation of the Court's CM/ECF electronic filing system, on this 12th day of July, 2010, addressed to:

> David L. Lee
> Law Offices of David L. Lee
> 53 W. Jackson Blvd., Suite 505
> Chicago, IL  60604-3453

/s/ Thomas S. Bradley
_____
Thomas S. Bradley
